The next case this morning is 522-0140 People v. France. Arguing for the defendant appellant is Richard Whitney. Arguing for the state appellee is Adam Rodriguez. Each side will have 10 minutes for the argument. The appellant will also have five minutes for rebuttal. Please note only the clerk is permitted to record these proceedings. Good morning, counsel. Good morning. Mr. Whitney, are you ready to proceed? I am, your honor. Then go right ahead. May it please the court, counsel. Good morning, your honors. Richard Whitney, representing the defendant appellant Brian K. France. Your honors, in this appeal, we raise two main issues as well as a minor issue requesting that this case, at the very least, be remanded to address a clear error in the mitimus. Our main issues, however, are first that the trial court erred when it denied Mr. France's motion to suppress electronic data seized from his cell phone without a warrant, principally video recordings and photos, where he never consented to police seizing any data from his phone other than a series of text smother. If and only if this court is not persuaded that his convictions need to be vacated based on this unconstitutional search and seizure, then our second main argument comes into play, which is that two of his three convictions for aggravated criminal sexual assault must be vacated under the One Act Crime Rule, and his conviction for unlawful restraint must also be vacated because unlawful restraint was a lesser included part of the offense of criminal sexual assault as charged. Now, unless the court has a lot of questions regarding the first issue, I don't intend to spend much time on that because this court can, will, and will see and hear for itself exactly what transpired and determine for itself what a reasonable person would have understood in the exchange between the officer and Mr. France because it was all recorded. Therefore, your review is essentially de novo since the trial court relied on the same recorded evidence rather than any determinations of live witness credibility. The video of the first interrogation clearly shows that all Detective Raymond said that he wanted from Mr. France's cell phone were the text messages he exchanged with Tammy, and he admitted in his testimony that that was all he wanted at the time. The video also shows that those text messages are the only things that Mr. France consented to allow Raymond to download from the phone so that they could all be viewed on one page, which is what Raymond said was the main reason for it. It shows that Mr. France's hasty signing of a written consent form did not expand the scope of that consent since he never read it, and it was never explained to him as permitting a broader search. In short, there's not one shred of evidence that either Detective Raymond or Mr. France either asked or stated or implied that the search of the cell phone could extend beyond Mr. France's text messages with Tammy. Let me stop you for one second. With regard to the, this is just a little technicality I wanted to answer. On page 35 of your brief, you indicate that your client is legally blind and he did not have his glasses with him at the time that the consent form was put in front of him. Can you tell us, is he nearsighted? Is he farsighted? What does legally blind mean? Well, I really can't get beyond what's in the record. It did establish that he normally wore glasses, didn't have his glasses with him. I realized that obviously he could see at least some of the messages because he was, you know, going to get out. Right. So he's not legally blind, of course, does not mean literally blind, but we simply don't have enough information in the record to establish what his actual visual acuity was and so on. Simply that, you know, it just adds a little bit of force to the argument. But I think really the main thing here is the video shows that he didn't read it. Right. The other thing is, and I know you'll probably get to this, but the statement that he makes at the end of, essentially at the end of the first interview, where he unlocks his phone and hands it to the officer and says, you can take it all or something along those names. You can have the whole thing. Right. Right. And I, you know, I've read all the briefs very thoroughly, and I have to commend you on a very well written brief. And I'm thankful for that because over the last day and a half, we've seen some bad ones. So I'm always glad to see good ones from both of you guys. But with regard to with regard to that statement, isn't it reasonable, even in light of the fact that the officer had only suggested he needed text messages? Isn't it reasonable for an officer? If someone hands him the phone, he's in a police station, he knows that there's an investigation. And this is all brought up in Mr. Rodriguez's brief, that, you know, he's there's a death investigation. There's a woman died in his car. They're asking him questions. He's in a police station. He hands him a phone. He knows at the time that he's handing the phone what's on his own phone. And he says, you can have it all. How does that with the with the reasonableness and this objective understanding of what a police officer should know when that took place? Right. Well, again, first of all, we have to look at it in context. This occurred as Detective Raymond was scrolling through the phone and skimming through the contents of the text messages. And I think it's important to note that Mr. France, when asked if by Raymond, if he could have the code to his phone, didn't say yes. Yeah, here, go ahead and I'll give you the code so you can always open it. He said, no, I'll just leave it here where the text messages were. And and you can have the whole thing again in context. I think it's referring to the text messages only not to you can have whatever's on the phone. Otherwise, if you wanted him to have whatever's on the phone, he would have said, sure, I'll give you my code. But he didn't. He was very careful to say, you know, here's here it is. Just keep it on this page, you know, or this screen. And I don't recall anything in the record suggesting that he even had any kind of a passcode on his phone other than he opened it, which is kind of ambiguous. Did he just turn it on or did he have to put a code or a facial recognition or biometrics or whatever it was? But but how did and I'm jumping ahead here because I know you have time. But in in the appellees brief on page five, it talks about where the officer came back in after he had taken the phone out of the room and said to him, there's some pictures on there, it's going to take a little while longer, something to that effect. That didn't that prize him that they were looking at everything on the phone and did your client object or say, wait a minute, you weren't you're only supposed to have the text or anything of that nature. And to follow up that, is it required that he do that? Well, to answer the second question first, no, it's not required. So you can't you can't attribute an affirmative an affirmation of consent from silence. But also, again, in context, I think a reasonable person would understand that statement to mean not that we're downloading the photos, but because there's so much data on this phone, we're having a hard time extracting what we really want, which is the text messages, or at least certainly that's one way to understand that, you know, if there's if there's a lot of, you know, if you're using a lot of space on your hard drive, certain functions are slowed down. I think everyone in the computer age probably knows that I assume the same thing is true of cell phones. So if you're trying to extract data from cell phones, and there's a lot of data on there, it could make take a longer time to find what you're actually looking for, which in this case, was the text messages. So I, you know, it's twofold. Number one, he wasn't required to say, oh, wait, no, I don't, you know, I don't want you looking at pictures. You know, he his silence, you can't infer anything from silence, there has to be an and secondly, in context, again, I don't think I think it could be understood at least more than one way. Well, your honors, I don't know if I have much time to get into my second issue here at this point. Well, actually, Mr. Whitney, you know, there is a lot to this case, on issue one, obviously. And like you said, depending on issue one, we get to issue two. So I'm going to give you you know, some a little bit of time to at least make that argument. And I'll gladly give Mr. Rodriguez any extra time he may need. So so that we hit both of these issues. I want to give counsel time to do so unless Justice Barbaros or Justice Vaughn has any issue with that. I certainly don't. That's fine. Yeah, I'll be brief. I think I can encapsulate it like this. The second issue is more complex because we have like three sub arguments. But the essence of it is this. As a matter of law, Mr. France committed only one sexual assault of Brandy Novotny. Yes, he digitally penetrated her three times. And that was obviously a criminal act. But he did this during a single course of conduct. All right, let's stop there for a moment. Just as always going to give you the half a day because of all my questions, I'm sure but my so my concern with that argument is that the testimony or the evidence suggests that while he digitally penetrated her at one point, there was a matter of time where he made a phone to his to her mother after that, and then committed the act a second and third time after the phone call. Doesn't the phone call act as an intervening act to stop that first assault? Well, that's that's fair, Your Honor, but I don't think it was a significant enough intervening act to qualify when all three of the acts occurred in just over 10 minutes. It wasn't a different kind of act, right? There was, yeah, at best a very brief interruption in the assault, but it was still we would maintain one assault looking at all the facts and circumstances in the amount of time. But yeah, you know, there's potentially an argument there. But then that goes to some of our other arguments, our second sub argument that at the very least, even if if this court concludes that there were there was enough of a division or interruption to say you could call it three acts, there was only one act of positional restraint, which is what made it aggravated. And that that comes to the next argument that at the very least, two of the three should be reduced to simple criminal sexual assault rather than aggravated because he was only Brandy was only put in a position of impaired breathing once wasn't, you know, wasn't put back in the same position three times. It only happened once. And that occur and the the agonal breathing and the part that the pathologist testified to as contributing to her death from the heroin overdose. That his testimony was that occurred after the third assault, some 20 minutes afterwards. So was it heroin? Yeah, it was heroin, heroin. For some reason, I was thinking it was fentanyl meth. You know, I'd have to go back. I thought it was heroin. I'd have to check myself. But OK, yeah, I understand. She died of an opioid overdose. Yeah. Let me ask you one other question with regard to what you're dealing with right now. Excuse me. As far as the positional asphyxiation, our positional restraint. My understanding, both of you have an opportunity to correct me if I'm wrong on this. But at one point, the videos or the pictures depict her with her head on the floorboard near the pedals of the vehicle and that her chin was pressed up against her upper torso with her legs up in the air. There's no indication that he had his leg over the top of her at that time. Um, but then later there was apparently a depiction of him with his one leg over like her head or something and one over her body. Are both of those considered? Positional restraints or. I mean, let's put it this way. I don't know this woman. I don't care how big the vehicle is and my chin was up against my chest. I'm not going to be able to get out of that without some help. Right, that's without somebody throwing their body weight on top. Sure. Questioning was there were there two incidents of that that are, you know, did both of those constitute separate incidents of of restraint or was it just the one with his body on top of hers? Well, the reason it's a little complicated is the term positional restraint, I think, was the pathologist term describing cause of death. But we're also talking about unlawful restraint as a separate offense. And as charged in the information, it was the unlawful restraint occurred when he restrained Brandy with his legs on the floorboard of the truck. And that was the state's argument that this was the unlawful restraint. I think so. So that's I guess I was using the wrong term. Even with the unlawful restraint, though, if you place someone in that position again, without putting your body weight, the leg over the top of her, you put her on the floorboard with her head on her chest and her some sort of unlawful restraint in and of itself. Because as I said, you put me in that position, I'm going to need help to get out of it. Well, if you're passed out, and she was passed out, and that was another, you know, one of the other facts and circumstances here. But at one time, she was kicking and screaming while he had her in that position and digitally penetrated her. Right. Took pictures of her and everything else. So she wasn't passed out the entire time she was in that position. Right. Well, for the unlawful restraint, it has to be a physical act committed by the defendant. So and as charged, apparently, it was the act when he put his leg over her. And maybe that was part of what got her in that position where she couldn't breathe. I think that was the state's Okay, but just so that I'm clear, you're not suggesting there has to be some kind of physical hold, hold on the person to have unlawful restraint. So if I took someone and I put them in a cage, I'm not physically have my hands on them. But they can't get out of that cage. Or I can handcuff them to me, and then they're restrained. Or I can knock them down on the truck and put them in a position where they can't move or leave that truck. Isn't that a lawful restraining of itself? Right. But but in all those instances, there is at least some physical act by the defendant, even if it's to push the person into the cage or force the person into that position. And I think that was the state's theory here was that he did that. He put her in that position, put his leg over her to keep her in that position. And once she was in that position, he didn't have to continue using force for her to have the impaired breathing. It was just the position she was left in. And and so I think that's the best we can clarify it, you know, in this, in this particular case, but there there had to be some physical act that got her restrained, even if it was a very fleeting one, where he put his leg over her. And that was, again, the state's theory in this case. You look like you're forming a question, Justice Barberis. No, sorry. Okay. I apologize. Well, that's the essence of it. Apart from that, since we are well over time, I'll save any other remarks for rebuttal. Thank you. Thank you, Mr. Whitney. Mr. Rodriguez, go right ahead. Thank you, Your Honor. Good morning, counsel. May it please the court. The trial court properly denied the defendant's motion to suppress evidence where defendant knowingly and voluntarily consented generally to the search of his entire cell phone. In this case, the trial court's findings of historical fact were not against manifest way to the evidence where the defendant knowingly and voluntarily consented to the forensic analysis of his cell phone. He never placed any express limitation on the scope of the search he consented to, and the facts in this case supported the denial of the defendant's motion to suppress. The defendant brought up an issue about the standard of review. I'd like to address that very briefly. The defendant asserts in his reply brief as well as this morning that no deference is due to the trial court's findings of historical fact because the defendant's consent were recorded on video, and therefore this court is in the same position as the trial court in regards to reviewing that video evidence. The state rejects that claim. Our response is twofold. First, the three first district decision defendant sites to support that proposition, Lozano, Cox, and Allen, are either legally inapplicable or factually distinguishable. In Lozano, it cited another case, Shaw, for the proposition that less deference is due to a trial court's findings of historical fact when that determination was based on video evidence. However, in that case, the appellate court stated that the victim's reference to the defendant having a gun during robbery intrinsically was linked to his credibility, and therefore, after reviewing the video evidence in that case, the court found that it actually impeached the said he was being robbed by the defendant or when the defendant was allegedly fleeing from the police. As such, the victim's testimony about the use of the gun was directly impeached, and the court said, you therefore don't give any deference to the trial court's findings regarding the defendant's statement of events. In Cox, the court stated generally that when you have a motion to suppress a decision and you're reviewing it, that's based on video recordings and not live testimony, which is what occurred in that case, then review is de novo. And finally, in Allen, the appellate court applied de novo review to whether evidence was admissible under the rules of evidence. Therefore, you know, as those three cases show, the court was applying a de novo review when you had victims or witness statements that were directly contradicted by the video evidence, when the court was engaging in de novo review of issues regarding the invisibility of none of those circumstances apply here. And which leads me to my second point, the trial court's determination in this case and denying defendants motion to suppress was based on its credibility determination of detective Raymond, its interpretation of the meaning of defendant and detective Raymond statements regarding consent and scope of the consent and resolution of those competing inferences related to defendant to the defendant's consent. So therefore, the court, since it applied or drew reasonable inferences and assess witness credibility and made objective assessments, this court is required to apply deference to the trial court's findings of historical fact. Therefore, defendants claim this court would review this issue de novo has to fail. Substantively, the trial court specifically found that defendant generally consented. The trial court found that defendants repeated references to information identifiable on his phone generally indicated that he was consented to a search of his phone. I think this court's questions during my opponent's oral argument draw that out, that you look at this under the standard of objective reasonableness, and an objective reasonable person would understand that detective Raymond's questions or detective Raymond's request to perform a forensic analysis was all inclusive of his cell because I'm having, I think this is a difficult part for you to get through for the state's case in terms of when you say that it's reasonable to assume that the defendant knew that he was off, that the trial court found the defendants repeated bringing up of what was on his phone indicated in some way that he was offering the phone, not just that particular information, coupled with detective Raymond's request for information, specific request for information on the phone. My reading, and please inform me where I'm missing something perhaps, was that there were lots of questions from detective Raymond with regard to the text messages and phone calls made between the defendant and the victim's mother, and everything that I read concerning the defendants bringing up information that was on his phone only involved those things. I don't recall anything where he admitted, you know, in the first interview, where he admitted that there were pictures, that there were videos that pertain to what the officer was investigating. So how do you get around that? I understand what the trial court found, and I'm looking for a reason to find, you know, reasonableness in what she did, or deference to what she did. So tell me how I can do that. Certainly, Judge. I'd point the court to People v. Barry. It's a case that the people cite in their brief, and in there it indicates that a defendant's lack of knowledge of what the officer is searching doesn't change the effect of their general consent. If the consent search was open-ended, a reasonable person would have no cause to believe that the search would be limited in some way. In this case, initially this defendant who brings up the events leading up to the victim's death, a whole host of information on his phone that was inclusive of text messages but not narrow to only that. I would direct the court to page 3 of the people's brief in discussing the events leading up to the victim's death. The defendant references location data on his phone in text messages where he was. He discusses references to 911 calls. He discusses a call made by the victim. He references a whole host of information inclusive of, but not limited to, just text messages. It's in fact the defendant who brings up the text messages as trying to establish his narrative of events, but Detective Raymond's questions were always broad-based in regards to wanting to look at the defendant's phone. He, of course, references a text message, but Detective Raymond used more inclusive language, more generalized language about wanting to perform a forensic analysis on defendant's phone, and they'd be able to, through that process, view text messages, but it was never narrowed to that circumstance. So let me ask you a follow-up then. With regard to, you know, the detective's state of mind at the time did not have the defendant as, you know, a prime suspect in a murder or anything of that any pictures or videos, so he couldn't have been my, this is my understanding, and both of you can correct me where I'm wrong, I'm sure I'm wrong somewhere, that there was no, he wasn't being deceitful, he wasn't trying to, you know, be sneaky about getting to the photos because he didn't know anything about them and had no reason to suspect this individual in the murder of the at that time, but is that relevant, that he didn't consider this, the defendant at the time, a suspect? No, your honor. I think under Barry, in considering the totality of the circumstances surrounding the exchange between the defendant and Detective Raymond, this court's going to look at what a reasonable person would know, would have known that the scope of Detective Raymond's involved, what information went into, you know, or was related to the permission that he was requesting for the consent search, and here it was all this broad-based, you know, and analyzing the knowing aspect of that, this court's going to look at the stated objective, and the stated objective of the officer's request was to identify information related to the events leading up to the victim's death. That isn't just going to exist on that text message conversation. As I indicated, the defendant was the one who referenced a whole host of different facts that would have allowed the officer and detectives to more, you know, more clearly outline the events leading up to the victim's death, timeline to establish where she was, when things occurred. Most certainly, I think your honor is correct, at the time that the defendant was being interviewed, he wasn't a suspect. I think, you know, it's very clearly stated by Detective Raymond during the interview, you know, we're just trying to figure out this investigation. This is a death investigation. It's a suspicious circumstance where the victim died. They're attempting to piece together information as part of this investigation. So certainly, at that point, the defendant's aware that the officers are looking to determine what occurred with Brandy's death, where she was, who defendant spoke to. He indicated he was the only person with her. Their phone, his cell phone, and the information identifiable on it would have absolutely been of relevance to the detectives during this death investigation. And so, looking at under that, the barrier analysis, if the defendant didn't know that the detective was specifically looking for that kind of information, that doesn't change the effect of his general consent, because it's what you look at a reasonable person, understanding the context of the discussions between the detective and himself, and what the scope of this investigation was. And given that death investigation, it's going to be very reasonable, it's going to be all inclusive. Well, and I do know that there was a case cited by one of you, probably by Mr. Whitney, with regard to a police search, and I apologize, I don't remember the name of the case, I didn't write it down, but it's in the briefs, concerning a search of a defendant's trailer that he was hauling. And the defendant in that case gave the police officer the right to search the trailer because the officer had asked what's in the trailer. He said, I'm moving furniture or something of that nature. And the court found that when he opened the back of the trailer and saw furniture, that's confirming what the defendant had said, and that's all he had the right to go into. He didn't have a right to go in and start tearing things apart to find what was hidden in the crevices. How is that different from this case? Certainly. I think Your Honor is discussing the Belfazard case. In that case, the court said that the request was narrowly tailored to only identify whether the driver's personal effects from the back of the trailer. So therefore, when the door opened and he was able to see that there was backpacks and sort of personal effect items there, that consent was satisfied, or the extent of the opening boxes and things like that. In contrast to Belfazard here, we don't have Detective Raymond narrowly tailoring and narrowly limiting the scope to merely just the text message conversation. While the defendant was the one who referenced that, based on the standard of objective reasonableness, we'd have to look at the entirety of the conversation. And the entirety of the context of this conversation was about the totality of the information identifiable on the victim's back. Let me stop you again. I apologize. And I'm so glad that Justice Bowie has graciously allowed both of you additional time because I have lots of questions. So comparing that Belfazard case to the case at hand, when you suggested that in our case here, it wasn't a narrowly tailored request for specific information, I don't recall any specific questions or requests for any of the things that you mentioned earlier about the location data, about anything that could be pulled off of the phone. Now I understand the officer's mind might have, we want to do a forensic search of your phone, means one thing. I'm not sure that the defendant understood exactly what that meant in regard to those types of things that they could get off of the phone. But in tying that together with the written consent that he signed, uh, if we take as, as, you know, unambiguous that he didn't read it prior to signing it, and that the officer, although he attempted to start to tell him what was on the form, was interrupted by the defendant and then didn't finish telling him what was on the form. And then when we look at the video and see just how short of a time that form was actually in the defendant's signed it, um, what, what, what can we make of the fact that he didn't read the form or see the form? Is it enough to assume that he had the ability and the opportunity to read it? Or is there, does case law require that more be done to, uh, to say that written consent kind of overrides any other verbal consents that were given or not given? So certainly not. So, um, the written consent does not override verbal consent. Under Florida v. Gimeno, if a defendant's consent would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization. Regarding the presence of the written form, defendant was informed that the detective was looking to obtain his consent. He referenced the consent form. It outlined the information. It's certainly a fact that this court can consider in its totality to understand the reasonableness of the request and the reasonableness of, uh, the defendant being informed that the detective wanted to perform a forensic analysis of his cell phone and what went into that. The fact or the consequence of defendant, um, sort of signing it in an offhanded manner to just, you know, further on with his consideration is only related to defendant's subjective knowledge, which is not what he engaged in the circumstance here under objective reasonableness. You're going to look at the totality and understand both the statements that were being made, as well as the fact that detective Rand was introducing a consent form that allowed him to understand fully and a reasonable person at that point would understand I'm being given a consent form. I've been told that detectives are investigating a death that occurred in my car. They most certainly are going to want information and therefore asking, you know, can we obtain your consent for this? A reasonable person would understand that was going to be a broad based, uh, consent. If he would have looked at that information, certainly that would have confirmed it. I think defendant understood that because his subsequent conduct never indicated any sort of confusion or rejection by that. When the detective walked in and told him, um, you know, we're, we're continuing the forensic analysis. It's taking a bit more time because of pictures. Defendant didn't say anything. While my friend on the other side would argue that that statement, um, holds no value. It does because it shows that defendant understood that the consent was broad based. A reasonable person at that point, even conceding or even accepting defendant's argument that he only sought to narrowly tailor the, uh, the search to that text message conversation at that point would have said, wait, excuse me. I only meant to allow you to look at the text messages. I didn't say anything about downloading information. And the fact that we're even engaging in, you know, competing inferences or competing interpretations of these statements is another reason why we give deference to the trial court because it heard these arguments, it considered this testimony, and it found that the detective's consent was general and linked to the cell phone in its entirety. Okay. And I don't know exactly how much time Justice Brewer had in mind when we said we'd everybody an additional time, but I do have one other request, and that is I found very interesting your argument about the, um, um, I forget how you phrase it in the, uh, in the brief about the, uh, this information would have been discovered regardless. I think you mean the inevitable discovery. Thank you very much. I could not think of the term. Um, uh, what can you, just to kind of lead us through that in a quick fashion? Absolutely, Your Honor. So, um, do that unless you have something that you think is much more important to discuss first, and then you can just give us a real brief synopsis of that part of your argument. Sure. Um, so as this court stated, under People v. Shanklin, to have inevitable discovery apply, you need three circumstances, of which really only the second one is relevant to this discussion, that the evidence would have been found by an independent line of investigation untainted by the illegal conduct. It's clear that an investigation was already ongoing even before, and that the condition of the evidence would have been the same because the defendant later stated he never deleted anything. So, whether the people, um, would have identified this information through the consent search or the subsequent obtaining of a search warrant, uh, the information would have been the same, would have been in the same position. Um, even if you delete something it's not truly deleted, it merely shifts through a different box. So, um, under that second point of Shanklin, um, the defendant indicated while he was talking that his phone contained the information, uh, as I argued, uh, a whole breadth of information related to the events leading up to the victim's death. All of those facts would have been relevant to a drug-induced homicide investigation. They were certainly relevant to the investigation regarding the victim's death. Therefore, since that independent investigation was already going on, if defendant had stated, you know, I don't want to give you my consent, uh, given everything that occurred at that point was known, uh, the detectives most certainly would have had probable cause to, uh, obtain the issuance of a warrant and search that information, and therefore that information would have been inevitably discovered, um, through the warrant, uh, for the reasons I just summarized. Okay. Thank you. Your honors, I, I would like to address the second issue very briefly. I'm aware of Justice Louie's, um, keeping time on this, so I will be as brief as I can. Um, uh, in this case, defendant's criminal conduct consisted of multiple and separate acts involving distinct breaks in time. Uh, defendant's acts did not constitute one continuous course of conduct, but rather three separate acts of aggravated criminal sexual assault. Therefore, defendant's convictions for aggravated criminal sexual assault were not carved from the same physical act. And in regards to defendant's conviction for unlawful restraint, that was proper because unlawful restraint is not a lesser included offense of criminal, uh, sexual assault. Um, as the case other people cite makes very clear, multiple penetrations of a victim, uh, constitute separate invasions of their body, uh, under People v. King, those are separate acts which would support a conviction. Um, I'm not going to belabor that point. I think defendant's argument, uh, attempts to try to make this one big broad course of conduct. Most certainly it wasn't. The evidence in this case delineated separate times, separate acts. Defendant's own conduct created additional intervening acts. As your honor identified, he, uh, took a phone call at one point and then also additionally, defendant switched the manner in which he was recording these then stopping and turning on his camera to then take a multitude of pictures and then shifting back over to shoot video again. So even under defendant's argument, you have a whole host of intervening acts here. The phone call, the shifting from the, uh, video recording to the photo to the, um, video recording again. And in regards to, um, the argument about unlawful restraint, in this case, there was evidence that the defendant endangered the victim. Uh, the victim's life more than once when he committed the three acts of aggravated criminal sexual assault. Um, each time defendant restrained the victim and penetrated her, he engaged in a separate act of endangering because that caused the victim to attempt to fight defendant's penetration. She scratched her bowel and that would cause her to become more affixed in the identified, uh, during defendant's oral argument, uh, that had a cumulative and compounding effect on the victim. She became more tired. She became more affixed in a position where her head was, uh, shifted down and also stuck lower in a more uncomfortable area of the truck bed, therefore compounding the, uh, you know, agonal breathing that detectives or that Dr. Saharal testified about. So that endangered her each of those times because it caused her to become more tired. It caused her to have more labored breathing, to be ultimately more, um, twisted into a position where she could not get out of, which endangered her life. So, uh, contrary to defendant's argument, most certainly the evidence, uh, of endangerment and three separate acts of endangerment, uh, did exist. Well, thank you, counsel. Um, before we get to Mr. Whitney's rebuttal, Justice Barbaras, Justice Vaughn, do you have any questions? I had a lot of questions, but Justice Barbaras used up my time, so I'll just I was going to say that. Are you sure you want to ask that question, Mark? No, I do not. Thank you. Thank you. Uh, Mr. Whitney, go right ahead. Okay, I'll try to be brief. There's a lot to unpack here, but, uh, first of all, with respect to counsel's point that, uh, there was no express limitation placed on the consent. Well, there doesn't have to be. The burden is on the state to prove that that there was consent. It's not the defendant's burden to prove, uh, that there was not consent. And we... That kind of leads into one of the questions I did have. Is our focus on Detective Raymond's reasonable expectations based on what the defendant said, or is our focus on what the defendant reasonably believed based on their conversations, or is it, as Mr. Rodriguez said, a totality of the circumstance? Do we consider all that, or is our focus on one place or the other? Well, there has... you have to look at the totality in the sense that you have to hear, in this case, and the facts of this case, is that Detective Raymond, from the very beginning, made it abundantly clear that his interest was in... it was in being able to download these text messages with Tammy for... for his investigation. And incidentally, there was no homicide investigation at this point. It was investigation of a death. There's reference... been references to murder here and homicide, but no one's charged with homicide. And I apologize because I just throw out all those words when it's really out of my head. So it's investigating a death. There was, you know, and... and that gets to one of the other points that I'd like to make in response regarding that the, you know, the... the scope of the consent here is that the detective never said, I want a forensic analysis of the contents of your phone. That just never happened from the very beginning. It was all... always about and exclusively about the... these text messages. And as with respect to the inevitable discovery doctrine, that doesn't apply here because there is no reason to suppose that had the search only been limited to those text messages, and that was all that the state had... the... the officer had retrieved from the cell phone, there would have been no reason to suspect that there was some other evidence of foul play here. It wouldn't have given rise to a warrant. So you can't backdoor this thing by saying, well, it's inevitable discovery because if we had the information about the... about the video and the... and the photos, then we would have had a basis for a warrant. That never would have happened had the Constitution been followed in the first place and the search not permitted because it exceeded the scope of what was actually requested. I would also just briefly point out that as far as the standard of review, that counsel's efforts to distinguish the Lozano and the Cox cases, etc., that was not done in his brief. That's the first time we've heard this as an oral argument. And accordingly, you know, I... I don't have, I think, a real chance to respond to the attempts to distinguish these cases, but I would point out that we're only... we only cited those cases for the proposition that deference is not owed to the trial court when the... this court can see exactly the same evidence upon which the trial court relied. And that's really the point here. It can't. The whole thing is here. What the trial court did do, though, is it made errors of fact in its findings of fact when it relied on this blue in the face comment and presumed that this means that this was some sort of license to review the phone until you're blue in the face and get all the data until you're blue in the face. When the context was clearly... it was when Raymond was looking through the conversation on his phone and he said you can look at Tammy until you're blue in the face, not Brandy. Tammy clearly referring to the text messages. Again, it was always about the text messages. As far as the... going back to the second issue a little bit, the counsel mentioned that there's... we're relying on competing inferences here. Well, again, it's this... the state's burden of proof on the first issue. But as far as the point about her struggle, Brandy's struggle, compounding her agonal breathing, I would just point out that we don't really have a basis for that. Counsel is not a medical expert. We don't have any basis to decide that her struggle was what contributed to her death. All we have is the testimony of the pathologist saying that it was the position is what caused the agonal breathing. And he testified that this occurred after the... well after the assault had already been completed. There's probably a lot more. We could probably talk about this for another half hour. But I don't want to... I do want to respect the court's time and would simply ask that this court grant the relief as requested in the briefs. Thank you. Well, thank you, counsel. I dare ask Justice Barberis and Justice Vaughn any final questions before we let these attorneys go for the day. I have no questions, but I do want to commend both parties on a fantastic argument. Your grasp and recall of all the facts of the case and your briefs and each other's briefs is great. The briefs are wonderful. I would suspect that if both of you were asked to argue the opposite side of this case, it would be just as a wonderful argument. And so I'm always happy when the lawyers are good. And I look forward to the next visits with you guys on other cases. Thank you very much, Your Honor. Thank you, Your Honor. Appreciate that. Well, you took the words right out of my mouth, Justice Barberis. I was gonna say the same thing. It has been a pleasure, gentlemen. Again, the briefs were outstanding and the argument... maybe some of the best arguments I've heard since being on the court. I commend you and agree with everything Justice Barberis just said. Did we get that on the record? Okay, no. We did. We did. It's a very difficult case. Very complicated case. Very difficult case. Yeah, you all... both of you did an outstanding job. And obviously, gentlemen, we'll take the matter under advisement. We'll issue an order of due course.